UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT WILBER,

     Plaintiff,

v.

COUNTY OF JACKSON,
JACKSON COUNTY SHERIFF
DEPUTY GILLMAN, JACKSON
COUNTY SHERIFF DEPUTY
BOOMER, DEPUTY CLIFFORD
RISNER, DEPUTY GERALD
PRATT, DEPUTY ANGELO
PANONE, DEPUTIES JOHN
DOE'S #1-6, RHONDA SCHULTZ,
and NURSE JANE DOE,

     Defendants.

Case No. 13-cv-14524
Honorable Laurie J. Michelson
Magistrate Judge Michael J. Hluchaniuk

---

**OPINION AND ORDER GRANTING JACKSON COUNTY'S MOTION FOR
SUMMARY JUDGMENT [65], DENYING SCHULTZ'S MOTION FOR SUMMARY
JUDGMENT [66], AND GRANTING GILMAN AND RISNER'S MOTION FOR
SUMMARY JUDGMENT [67]**

---

     Plaintiff Robert Wilber was a pretrial detainee in the custody of the Jackson County

Sheriff's Department when he began to experience abdominal pain, bloating, diarrhea, and loss

of appetite. Over the course of five days, Wilber made multiple requests to see a nurse, filling out

kites and describing his symptoms to the different deputies on duty. Each time, after the deputies

made contact with a nurse, Wilber was told that the nurse was unavailable to see him and that he

should check back later. Eventually a nurse, Defendant Rhonda Schultz, instructed Defendant

Deputy Gilman to place Wilber in medical isolation, where he remained for nearly a day. At that

point, his attorney arrived at the jail to discuss unrelated pretrial matters—but upon seeing

Wilber's condition, immediately demanded that Wilber receive medical attention. By the time

Wilber arrived at the hospital, he was septic and had a ruptured appendix. Ultimately, Wilber endured an ileostomy procedure. He claims that the remaining Defendants, two of the deputies, and one nurse on the jail staff, were deliberately indifferent to his medical needs, and that Jackson County had a custom or practice of not providing alternative arrangements for care when a nurse was unavailable to see inmates.

All of these Defendants have moved for summary judgment. (Dkts. 65, 66, 67.) The motions are fully briefed. After careful consideration of the briefs and thorough review of the record, the Court finds that oral argument will not aid in resolving the pending motions. *See* E.D. Mich. LR 7.1(f)(2). The Court finds that Gilman and Risner, who each had only one interaction with Wilber during the relevant time frame, were not deliberately indifferent to Wilber's serious medical needs because they took action to address those needs by calling medical staff. Nor has Wilber presented sufficient evidence that this was such a regular and unconstitutional practice as to impose liability on Jackson County for his injuries. But Schultz, who directed that Wilber be placed in medical isolation for nearly a day and examined him only after his attorney demanded that a nurse see Wilber, is not entitled to summary judgment on the claims against her. So the Court will grant the summary-judgment motions filed by Gilman, Risner, and Jackson County and will deny Schultz's summary-judgment motion.

## I.  FACTUAL BACKGROUND

The events giving rise to this lawsuit occurred while Plaintiff Robert Wilber was housed in the Jackson County Chanter Road jail facility awaiting trial on criminal charges. (Third Am. Compl. at ¶ 1.) The Court considers the undisputed facts in the light most favorable to Wilber, the non-moving party.

### A.  The Chanter Road Facility

The Chanter Road facility is one of two detention facilities operated by the Jackson County Sheriff's Department. (Dkt. 70-2, Gilman Dep. at 10–12.) It consists of two barracks and a central building that includes the command and control center as well as the cafeteria, nurses' office, and visiting rooms. (Dkt. 70-3, Risner Dep. at 32, 50–51.) Inmates can freely move about in the barracks and can also interact with the on-duty barracks deputy. (Gilman Dep. at 11–12.) Each barrack contains an office for the deputy on duty with an isolation cell adjacent to the office. (Gilman Dep. at 11–12, 20.) This cell can be used for either disciplinary or medical isolation.

Barracks officers are required to complete rounds of the barracks every 30 minutes and take head counts three times a day. (Gilman Dep. at 14–16.) Inmates are also monitored during meals. They are required to walk to the cafeteria in the central building for their meals and are required to take a tray of food. (Gilman Dep. at 47–48.) However, whether the inmates actually eat is not monitored. (*Id.*)

### B.  Jackson County Medical Policies

Jackson County contracts with Coordinated Care, PLLC to provide medical services to inmates in Sheriff's Department custody. (Dkt. 65-6, Coordinated Care Contract.) Dr. Michael Burgess oversees the medical services and monitors the medical staff, which consists of Nancy Yirk, Jackie Cox, and Defendant Rhonda Schultz.

The County's "Medical Treatment" policy provides the following procedure, in relevant part, for "injured" inmates:

> All injuries that occur in the absence of the Jail Medical Staff will be evaluated by the Corrections Officer assigned to the area in which the injury occurred. The Corrections Officer will telephone or page the Jail Physician (or designee) and

give him a detailed description of the injury and how it was obtained. . . . The Jail
Physician (or designee) will advise on treatment and/or transport requirements.

(Dkt. 65-5, Medical Treatment Policy.) County policy also provides that isolation cells may be

used for "medical isolation." (Dkt. 65-5, First Floor Specialized Housing Policy.)

In most cases, when an inmate requires medical attention, the inmate must complete a

kite. (Gilman Dep. at 41–42; Risner Dep. at 10–11.) But according to the County's handbook, if

a medical problem is serious, the inmate is to notify a deputy immediately and no kite will be

required. (Gilman Dep. at 33–38.) Posted signs stated that inmates were to notify the deputy on

duty if they needed medical assistance. (Gilman Dep. at 33.)

When a prisoner complains, the deputy generally will "try and get some information from

the inmate about his complaint, his condition, and relay that to the medical staff." (Gilman Dep.

at 33.) Generally "at least one" medical assistant would be there during the day. (Risner Dep. at

11.) In an emergency situation, if the deputy on duty can reach a physician, the physician makes

a decision about whether to transport the inmate to the hospital. (Gilman Dep. at 38.) But if a

physician cannot be reached, the deputy does have the ability to order that the inmate be

transported to the hospital. (*Id.*) However, Sergeant Peek testified that the officers "rely on the

medical staff to make [decisions on medical care], because we don't have the medical

knowledge," and so they usually "rely on what the medical staff tells them." (Dkt. 69-14, Peek

Dep. at 23.)

### C. Wilber's Illness

On October 19, 2011, at some point "after 11:00 at night," Plaintiff told an unnamed

deputy that he was suffering from abdominal pain and diarrhea, which he thought was related to

something he ate. (Dkt. 70-5, Wilber Dep. at 30–32.) He filled out a kite to this effect. (*Id.*) The

4

deputy gave him a bottle of Kaopectate and told him to contact the officer "the next morning and have that officer the next morning contact the nurse." (Wilber Dep. at 30.)

The next morning, October 20, Plaintiff approached Deputy Risner. (Wilber Dep. at 32.) Wilber informed Risner that he "spoke with the third-shift officer that night or the previous night, that [he] had abdominal pains, bloating, diarrhea, and that the officer gave [him] Kaopectate and [he] very much needed to see the nurse." (Wilber Dep. at 32.) Wilber says that Risner told him he would have to fill out another kite, which Wilber did either on the 20th or the 21st. (Wilber Dep. at 32.) The kite read simply, "help." (Wilber Dep. at 37.) Risner also called the nurse (whose name Wilber did not remember) in Wilber's presence, but he then stated that she was "unavailable" and so Wilber should "go lay down and . . . the nurse would be in touch with [him] or that the nurse would see [him]" but "it would not be that day and to go lay down and to file a kite." (Wilber Dep. at 32.)

Risner has no recollection of this conversation. (Risner Dep. at 25–28.) However, he did testify that if an inmate specifically complained "I feel terrible, I have severe abdominal pain, you can't imagine how I feel, I've been losing weight, I haven't eaten in a couple of days, I can't seem to go to the bathroom," he would treat it as an emergency and if the medical staff refused to act, he would "notify [his] immediate supervisor and he in turn could notify the doctor." (Risner Dep. at 27.)

The next morning, October 21, Wilber approached an unnamed officer and explained that he had talked to deputies on the prior two days and that the nurse had still not gotten in touch. (Wilber Dep. at 35.) The officer responded that he had not heard from the nurse. (Wilber Dep. at 35.) Later that afternoon, around 3:00pm, Wilber approached Deputy Pratt and asked if there had been any message from the nurse. (Wilber Dep. at 37.) Pratt said there had been no message but

he did call the nurse, who said she was "unavailable." (Wilber Dep. at 37.) That evening, around 11:00pm, Wilber spoke with another deputy (at the time of his deposition, he thought it was Deputy Boomer, but Wilber now acknowledges that Boomer was not working at that time). (Wilber Dep. at 39–40.) Wilber told the deputy he was suffering "extreme pain" and "begged" the deputy to call "the nurse, the doctor, anybody, shift command, anybody." (Wilber Dep. at 39.) The deputy made a phone call and told Wilber that the nurse was not available and that nobody could come from the downtown jail either.

On October 23, Wilber approached Deputy Panone and asked if there was any message from the nurse—there was none. (Wilber Dep. at 41.)

The next day, October 24, around 8:00am, Wilber's bunkmate (whose name he did not recall and who was not deposed as part of this lawsuit), approached two deputies on Wilber's behalf and brought them to his bunk. (Wilber Dep. at 41.) At this point, Wilber was "lying on [his] bed in the fetal position." (Wilber Dep. at 47.) Wilber told one deputy that he had not eaten for five days and explained his symptoms. (Wilber Dep. at 43.) The deputy left for about ten minutes and when he returned, he said he had spoken to "Nurse Ronda and Deputy Gilman." (Wilber Dep. at 44.) Apparently Nurse Ronda had directed the deputy to place Wilber in isolation. (Wilber Dep. at 48.) Wilber protested that he was in no condition to move or carry his things, so the deputy asked another inmate to help. (Wilber Dep. at 48.)

Gilman created a report regarding the same incident, but it is dated October 25 at 12:50pm. Gilman summarized, "Inmate Wilber feeling sick and not eating. Placed in medical isolation per medical staff." (Dkt. 66-6, Jail Incident No. 11-1434.) Gilman also stated, "R/O . . . called Nurse Rhonda, who was at the downtown facility to advise her of the situation. Nurse

Rhonda, advised R/O to put him in A barracks isolation to monitor his food intake until she could evaluate him. . . . The nurse will see him at a later date." (*Id.*)

Schultz testified that she would usually order an inmate into medical isolation "[i]f they're vomiting or they appear ill and I'm at the other facility, [she] will tell [the deputy] to put [the inmate] in their medical isolation, monitor them closely until I can get there, which is usually a 5-to-15-minute window." (Dkt. 66-7, Schultz Dep. at 56.) She also stated that she sometimes sends inmates to medical isolation to figure out whether they are faking an illness, because it is easier to monitor inmates when they are in the isolation cell. (Schultz Dep. at 57.) Gilman testified that he did not check to see when Schultz would come by, nor did he think to ask if anyone else was available. (Gilman Dep. at 92.) Wilber recalled at his deposition that he remained in isolation for two days (Wilber Dep. at 51), though based on Deputy Gilman's report it appears he was there for just one day.

Gilman's shift on the 25th ended at 3:00 p.m. when Deputy Broadworth relieved him. (Dkt. 69-10, Broadworth Dep. at 16–17.) Gilman said he would have told Broadworth that there was an inmate in medical isolation and that he should monitor the inmate's food intake. (Gilman Dep. at 80.) Broadworth's log entry at 18:56 stated that Wilber had not eaten his food. (Gilman Dep. at 79.) Wilber said that Broadworth did not allow him to use the telephone later that evening. (Wilber Dep. at 50.) Broadworth did not remember any conversations with Wilber. (Broadworth Dep. at 16–19.)

Montgomery relieved Broadworth at 11:00pm on October 25. Montgomery did not know whether Wilber ate anything while he was on shift. (Dkt. 69-11, Montgomery Dep. at 20–21.) Deputy Risner relieved Montgomery at 6:48am on October 26. (Risner Dep. at 33–34.)

On October 26, Wilber's criminal attorney came for a scheduled visit to discuss pretrial matters, and upon seeing his condition, asked the sergeant on duty, Sergeant Peek, for immediate medical attention. (Wilber Dep. at 52.) Sergeant Peek took Wilber to see Schultz. (Peek Dep. at 35.) When he saw her he "immediately became angry with her because—I said you've been here all this time. I remember saying to her I've been sick for a week and you're right here all this time and you couldn't see me. And she said sit on the bed." (Wilber Dep. at 52.) Schultz did not respond to Wilber's accusation. (Wilber Dep. at 53.)

Schultz testified that she did not remember getting any calls about Wilber before she examined him that day, and "if [she] was called, [she] would go see the patient." (Dkt. 66-7, Schultz Dep. at 54.) Schultz examined Wilber. He explained to her that he had been sick for "several days" with "bloating, extreme pain in my abdomen, some chest pains[.]" (Wilber Dep. at 56.) Schultz then examined him by pressing and touching different areas of his stomach and asking if it hurt—when she touched the right side of his abdomen, he told her that it hurt. (Wilber Dep. at 56.)

After Schultz examined Wilber, she sent him back to segregation so that she could call the doctor. (Wilber Dep. at 53.) Schultz prepared a written assessment after her examination. (Dkt. 66-8, Assessment of 10/26/2011.) She concluded there was a "Question of Appendicitis." (*Id.*) She asked Dr. Burgess for a verbal order to send Wilber to the emergency room. (*Id.*) In the meantime, Wilber remained in segregation for thirty minutes and then he was taken to the hospital in a squad car. (Wilber Dep. at 56.)

Plaintiff's hospital record indicates that on admission, he was septic, had been experiencing abdominal pain for two weeks with the pain becoming much worse over the previous several days, had diarrhea, gross hematuria (blood in urine) and a temperature of 102.7.

(Dkt. 69-7, Hospital Records.) The records also say that initially, "The patient does not appear to be in any acute distress. The patient does appear moderately ill." (*Id.* at 2.)

He was taken to surgery the same day. (*Id.*) During surgery, Wilber was found to have a "[l]arge right-sided intra-abdominal abscess with associated right-sided colitis." (*Id.*) The parties, however, agree that ultimately the root cause of the problem was appendicitis and that Wilber's appendix had ruptured. (Dkt. 67 at 1; Dkt. 70 at 20.) The surgeon performed a "diverting loop ileostomy." (*Id.*) Wilber's appendix and part of his intestine were removed. (Wilber Dep. at 62.) Later, he had another surgery to remove a right pleural effusion. (Hospital Records.)

### D. Procedural History

Wilber filed suit on October 29, 2013, naming Jackson County, Schultz, and several deputies as defendants. (Dkt. 1.) Since then, several of the original defendants have been dismissed, leaving Gilman, Risner, Schultz, and Jackson County as defendants. (*See* Dkt. 59.) Wilber's Third Amended Complaint (Dkt. 60), filed February 13, 2015, asserts three counts. Count I alleges that Gilman, Risner, and Schultz were deliberately indifferent to his serious medical needs in violation of the Fourteenth Amendment. Count II asserts a *Monell* claim against Jackson County, alleging that the county has a custom or policy of not providing alternate care to inmates if a nurse is unavailable. Lastly, Count III asserts a state law "gross negligence" claim against Gilman, Risner, and Schultz. All of the remaining defendants have filed motions for summary judgment. (Dkts. 65, 66, 67.)

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party may discharge its initial summary judgment burden by "pointing

out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

### III. ANALYSIS

Wilber alleges that each of Risner, Gilman, and Schultz wrongfully delayed medical care—Risner and Gilman by not bypassing the nurse's instructions and calling for immediate aid, and Schultz by delaying her visit to examine him. Wilber says that these failures also show that Jackson County should be held liable because their policies and training are deficient. The Court finds that Risner and Gilman took reasonable and appropriate action to address Wilber's complaints, and that their conduct did not rise to the level of a constitutional violation or gross negligence. And Wilber has not met his burden under *Monell* to hold Jackson County liable. But the Court does find a fact issue as to whether Schultz delayed medical care for Wilber even after learning of his serious symptoms, which she would later conclude were indicative of appendicitis.

#### A. Count I: Deliberate Indifference

In Count I, Wilber asserts that Defendants Gilman, Risner, and Schultz were deliberately indifferent to his serious medical needs in violation of the Fourteenth Amendment. Deliberate

indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).

### 1.  Gilman and Risner

Wilber asserts Gilman and Risner violated his constitutional rights when they did not seek medical care for him after learning that the nurse was unavailable to see him. Gilman and Risner say they are entitled to qualified immunity. Qualified immunity shields the officers from suit if they "reasonably believe[d] that [their] . . . conduct complie[d] with the law." *See Pearson v. Callahan*, 555 U.S. 223, 244 (2009). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* at 231. To defeat a qualified immunity defense, "a plaintiff must establish (1) that the defendant violated a 'constitutional right' and (2) that the right 'was clearly established.'" *Leary v. Livingston Cty.*, 528 F.3d 438, 441 (6th Cir. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). District courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. The officers seek summary judgment based on the first prong.

"The Eighth Amendment's prohibition on cruel and unusual punishment generally provides the basis to assert a § 1983 claim of deliberate indifference to serious medical needs, but where that claim is asserted on behalf of a pre-trial detainee, the Due Process Clause of the Fourteenth Amendment is the proper starting point." *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 539 (6th Cir. 2008). "[P]rior to the Supreme Court's recent decision in *Kingsley v. Hendrickson*,

—— U.S. ——, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015), it was well-settled in the Sixth Circuit (and virtually all others) that courts were to analyze an inadequate-medical-care claim brought by a pretrial detainee under the Due Process Clause in the same way as they would an inadequate-medical-care claim brought by a convicted prisoner under the Eighth Amendment." *Johnson v. Clafton*,— F. Supp. 3d — No. 13-14922, 2015 WL 5729080, at *4 (E.D. Mich. Sept. 30, 2015) (citations omitted). As will be discussed below, the Eighth Amendment standard includes both an objective and a subjective element. *Farmer v. Brennan*, 511 U.S. 825 (1994).

In *Kingsley*, however, the Supreme Court addressed whether a pretrial detainee asserting an excessive force claim needed to demonstrate the officers' subjective knowledge that their force was unreasonable. The Court held that the pretrial detainee did not: "a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.* at 1273–74 (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)). As this Court recently observed, "After *Kingsley*, it is unclear whether courts should continue to use the Eighth Amendment's deliberate-indifference standard to analyze inadequate-medical-care claims brought by pretrial detainees pursuant to the Due Process Clause." *Johnson*, 2015 WL 5729080 at *4 (citing cases). However, in a recent decision, our Court of Appeals addressed both an excessive force and an inadequate-medical-care claim brought by a pretrial detainee, citing *Kingsley* only on the context of the excessive force claim and applying the Eighth Amendment analysis to the inadequate-medical-care claim. *Morabito v. Holmes*, — F. App'x —, No. 14-3612, 2015 WL 5920204 (6th Cir. Oct. 7, 2015). And two other post-*Kingsley* Sixth Circuit cases, one published, analyzed inadequate-medical-care claims under the Eighth Amendment standard without citing *Kingsley*. *Linden v. Piotrowski*, No. 14-2158, — F. App'x —, 2015 WL

12

5603086, at *5 (6th Cir. Sept. 24, 2015); *Baynes v. Cleland*, 799 F.3d 600, 617–18 (6th Cir. 2015). So the Court will proceed under the Eighth Amendment standard.[1]

As stated above, that standard requires a plaintiff to demonstrate both an objective and a subjective component:

> The objective component requires the existence of a 'sufficiently serious' medical need. Such a medical need has been defined as one 'that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' The subjective element requires 'an inmate to show that prison officials have 'a sufficiently culpable state of mind in denying medical care.'

*Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010). "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994); *see also Garrett v. Belmont Cty. Sheriff's Dep't*, 374 F. App'x 612, 616 (6th Cir. 2010).

Turning first to the objective component, the question is whether Wilber has made "a showing that [he] faced a substantial risk of serious harm and that such a risk is one that society chooses not to tolerate." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568–69 (6th Cir. 2013); *Helling v. Kinney*, 509 U.S. 25, 36 (1993). In addition, because Wilber argues that he had a medical need so obvious that a lay person would easily recognize the necessity for a doctor's

---

[1] For other post-*Kingsley* decisions retaining the Eighth Amendment standard for pretrial detainees, see *Miranda-Rivera v. Toledo-Davila*, — F.3d —, No. 14-1535, 2016 WL 563070, at *8 (1st Cir. Feb. 12, 2016); *Gilbert v. Rohana*, No. 1:14-CV-00630-RLY, 2015 WL 6442289, at *4 (S.D. Ind. Oct. 23, 2015); *Carruthers v. Corrections Corp. of Am.*, No. 2:14–cv–72–WTL–DKL, 2015 WL 4758835, at *2 (S.D.Ind. Aug. 12, 2015); *Kennedy v. Bd. of Cnty. Comm'rs for Oklahoma Cnty.*, No. CIV–15–398–D, 2015 WL 4078177, at *1 n. 6 (W.D.Okla. July 6, 2015); *Roberts v. C–73 Med. Dir.*, 5198–GHW, 2015 WL 4253796, at *3 n. 3 (S.D.N.Y. July 13, 2015); *Austin v. Cnty. Of Alameda*, No. 15–cv–00763–HSG, 2015 WL 4051997, at *3 (N.D.Cal. July 2, 2015); *McBride v. Houston Cnty. Health Care Auth.*, No. 1:12–cv–1047–MHT, 2015 WL 3892715, at *15 (M.D.Ala. June 24, 2015); *Ray v. Michelle*, Civil Action No. 15–7–DLB, 2015 WL 4068022, at *7 (E.D.Ky. July 2, 2015).

attention, he need not "present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or deteriorated. Instead, it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 900 (6th Cir. 2004).

In *Blackmore*, the Sixth Circuit held that a pretrial detainee later found to be suffering appendicitis had demonstrated an objectively "serious need" where he "exhibited obvious manifestations of pain and injury," including vomiting, and "complained of 'sharp' and 'severe' stomach pains for an extended period of time"—two days. *Id.* at 899. In reversing the district court's grant of summary judgment in favor of the officers who did not seek medical attention for the detainee and instead administered antacids, the Court held that for the objective prong, it "was sufficient to show that . . . [plaintiff] suffered for two days, making unrelenting complaints and vomiting, a nurse identified 'classic signs of appendicitis' and doctors performed an appendectomy." *Id.* at 900.

Here, the Court finds that Wilber has satisfied the objective element. Wilber and Risner interacted on the morning of October 20. At that time, Wilber stated that he was experiencing bloating and diarrhea and that Kaopectate was not helping, and that he had spoken with the third-shift officer and filled out a kite the previous night in hopes of seeing a nurse. Risner had not seen Wilber the previous night; however, Wilber informed him that he had not been eating and had been experiencing pain for several days. And when Wilber filled out the kite Risner instructed him to file, he simply wrote "help."

Wilber and Gilman interacted on the morning of October 25. Gilman was approached by Wilber's bunkmates, who informed him that Wilber was ill. When Gilman saw Wilber, he was in

14

the fetal position on the bed and he explained that he had not eaten for five days and was experiencing severe abdominal pain. He also explained that he had been talking to deputies for days without any response from the nurse. The nurse instructed Gilman to place Wilber in medical isolation, and when Gilman took Wilber to medical isolation, he was in too much pain to carry his things.

Thus, both Risner and Gilman were aware that Wilber had been in severe abdominal pain, unable to eat, and experiencing intestinal issues—and Wilber told Gilman this had been happening for at least a few days. Moreover, Wilber told Risner that medication was not helping. Gilman also saw Wilber lying in the fetal position due to the pain, and saw that Wilber was unable to carry his things to the isolation room himself. When Wilber was finally seen by the nurse, she identified a "question of appendicitis" due to similar symptoms Wilber reported to Risner and Gilman. (*See* Dkt. 66-8, Schultz Report.)

However, Wilber has not met the subjective component of the test, which requires him to show "facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). The undisputed facts are that, during their lone interactions with Wilber, Risner and Gilman responded to Wilber's objectively serious medical need by following applicable Jackson County procedures: they called medical staff. Both relayed Wilber's symptoms to the nurse on duty. Both were told that the nurse would see Wilber at a later time. *Cf. Blackmore*, 390 F.3d at 900 (allowing a deliberate indifference claim to proceed against deputies who were aware of symptoms of appendicitis but declined to contact medical staff for two days). Indeed, at the time that Risner saw Wilber, he had only talked to one other deputy and had told that deputy that he

15

thought he was sick due to something he had eaten. Gilman followed the nurse's instructions to place Wilber in medical isolation, and by the time he left his shift there was still some time for the nurse to come and see Wilber. (*See* Dkt. 67-6, Schedule (showing that Gilman left at 3:00pm on October 25); Gilman Dep. at 65–69 (stating his belief that a nurse would generally be on duty until 5:00pm).) These were reasonable responses under the circumstances, and therefore Gilman and Risner are entitled to summary judgment on Count I.

### 2. Schultz

As to nurse Schultz, Wilber says that she violated his constitutional rights when she refused to see him after learning of his symptoms, refused to recommend alternate arrangements for immediate medical care, and directed the deputies to place Wilber in isolation instead of obtaining medical attention. Schultz, like Gilman and Risner, argues that she acted "reasonably and appropriately" with respect to Wilber's medical needs because, under *her* version of the facts, she was not contacted regarding Wilber until October 26 and at that point, she provided the necessary care and follow-up. (Dkt. 66 at 13–14.) The facts, however, must be taken in the light most favorable to Wilber. In that light, the Court disagrees with Schultz.

First, the record does not support the assertion that Schultz first learned about Wilber's condition on October 26. Deputy Gilman's report of October 25 stated that he contacted "Nurse Rhonda" (it is undisputed there was no other nurse named Rhonda) regarding Wilber's condition at 12:50pm. (Gilman Report.) So taking all inferences in Wilber's favor, as the Court must on summary judgment, Schultz knew about Wilber's condition at least the day before she actually examined him. Moreover, Schultz is one of only three medical assistants employed by the County (the other two are LPN Jackie Cox and Medical Assistant Nancy Yirk). (Schultz Dep. at 13–14.) Given that all of the medical assistants "worked days," though the hours sometimes

16

varied, there is at least a question whether Schultz picked up the phone one of the other times a deputy called in about Wilber. (Schultz Dep. 15.) Moreover, per Jackson County policy, inmate kites were sent to the medical staff, and a reasonable jury could infer that Schultz had access to those kites and therefore could have deduced that Wilber had made prior complaints over the previous few days.[2]

Even assuming Schultz only heard about Wilber's condition on October 25, the Court would still deny summary judgment. As stated above, the symptoms that Wilber exhibited at the time he spoke to Gilman demonstrated a serious medical need. Wilber testified that Gilman called the nurse (shown by his report to be Schultz) and conveyed those symptoms to her directly. And Schultz's own report shows that she used those same symptoms—specifically, Wilber's self-reports of severe abdominal pain—to reach a conclusion that Wilber might have a ruptured appendix. Yet, instead of immediately examining Wilber upon hearing about these symptoms, Schultz ordered that Wilber be placed in medical isolation and did not examine him until the next morning. And even then, she only saw him after Wilber's attorney demanded medical attention and Sergeant Pratt physically brought Wilber to the medical unit. And Schultz's own testimony reveals that the medical staff generally "sees [all prisoners] unless they're only asking for Tylenol or Motrin," and that she would usually order inmates into medical isolation only so deputies could monitor them until she could get there, which would

---

[2] Because the events from October 25 and 26 are enough to allow Wilber's claim to survive summary judgment, the Court will not address Wilber's contention that Schultz made an adoptive admission of Wilber's statement that she had been on duty all week and had ignored his requests the whole time. (Dkt. 71 at 21.) "When a statement is offered as an adoptive admission, the primary inquiry is whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement." *United States v. Jinadu*, 98 F.3d 239, 244 (6th Cir.1996). The Court notes that it is unclear from Wilber's testimony that Schultz understood his statement to mean that she had been getting reports on his condition all week and chose to ignore them.

usually be a "5-to-15-minute window." (Schultz Dep. at 23, 56.) This is enough to raise a genuine issue of material fact as to whether Schultz "subjectively perceived facts from which to infer substantial risk to the prisoner, that [she] did in fact draw the inference, and that [she] then disregarded that risk." *Comstock*, 273 F.3d at 703.

Accordingly, Schultz's motion for summary judgment will be denied as to Count I.

### B. Count II: *Monell* Claim

In Count II, Wilber asserts that when Risner, Gilman, and Schultz violated his rights under the Fourteenth Amendment, they were "acting pursuant to a custom and/or policy of the County whereby they would disregard . . . and/or ignore serious abdominal complaints by inmates . . . even where it was obvious that the inmate was in need of immediate medical attention[.]" (Third Am. Compl. at ¶¶ 27–29.)

The Supreme Court addressed municipal liability under § 1983 in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). There, the Court held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. Thus, "liability will attach only where the plaintiff establishes that the municipality engaged in a 'policy or custom' that was the 'moving force' behind the deprivation of the plaintiff's rights." *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007) (quoting *Monell*, 436 U.S. at 694)). "The *Monell* Court described a municipal policy as including 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated. . . .' An

18

actionable 'custom,' in contrast, 'has not received formal approval through . . . official decisionmaking channels.'" *Id.* at 607.[3]

Here, it is undisputed that Jackson County policy was that deputies should contact medical staff with inmates' medical complaints. (Dkt. 69 at 30.) Wilber acknowledges that "the policy of deputies contacting medical staff to handle inmate medical care is facially constitutional[.]" (*Id.*) The problem, he says, arises when "a deputy, having contacted medical staff and learned they are unavailable, is thereafter deliberately indifferent to an inmate's serious need for medical treatment." (*Id.*) The Court interprets Wilber's argument to be that Jackson County has "consistently implemented" its medical care policy "to result in constitutional violations with explicit or implicit ratification by city policymakers." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006).

"Where the identified policy is itself facially lawful, the plaintiff must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (citation and internal quotation marks omitted). Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997). "[A] plaintiff ordinarily cannot show that a municipality acted with deliberate indifference without showing that the municipality

---

[3] Though the Court has found that Gilman and Risner are entitled to summary judgment on Count I, the Court will still address *Monell* liability because "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an inconsistent verdict." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010) (addressing a *Monell* claim by a pretrial detainee's estate regarding the municipality's alleged nonresponse to medical requests); *but see Wilson v. Morgan*, 477 F.3d 326, 344 (6th Cir. 2007) (addressing a *Monell* claim premised on officers' alleged detention of plaintiffs without probable cause).

was aware of prior unconstitutional actions of its employees and failed to respond." *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997).

Wilber has failed to identify any prior incidents of inmates who were ignored by deputies after the deputies learned that medical staff was unavailable, or where deference to medical staff resulted in inmates being placed in isolation without treatment. *See Jones v. Muskegon Cty.*, 625 F.3d 935, 946 (6th Cir. 2010) ("[A] jury could not reasonably infer from . . . five incidents alone that the County had a widespread, permanent, and well-settled custom of ignoring inmate [medical care] requests."). Nor does he point to any evidence that Jackson County policymakers were even aware, much less accepted, that this was a common practice. *See Braswell v. Corr. Corp. of Am.*, 419 F. App'x 622, 630 (6th Cir. 2011) ("[T]here must be at least knowledge and acquiescence by the official policymakers of the municipality or corporation. Requiring anything less would devolve into establishment of *respondeat superior* liability.").

Nor has Wilber established inadequate training so as to give rise to *Monell* liability. In his Complaint, he alleged that "Jackson County failed to train its deputies and nurses to recognize the signs and symptoms of serious abdominal illness[.]" (Third Am. Compl. at ¶ 29.) "To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006); *see also Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 794 (6th Cir. 2012). There is no evidence in the record regarding the medical training officers received, nor is there any evidence of similar incidents occurring in the past. Thus, Wilber cannot "show prior instances of unconstitutional conduct demonstrating that [Jackson County] has ignored a history

20

of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury" or "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation" so as to show deliberate indifference. *Regets v. City of Plymouth*, 568 F. App'x 380, 394 (6th Cir. 2014) (quoting *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997)).

For these reasons, the Court finds that Jackson County is entitled to summary judgment on the *Monell* claim.

## C.  Count III: "Gross Negligence"

Wilber also asserts one count of state-law "gross negligence" against Gilman, Risner, and Schultz, based on the same facts giving rise to his § 1983 claim in Count I.

Gilman, Risner, and Schultz each assert they are entitled to governmental immunity as to Wilber's gross negligence claim. Mich. Comp. Laws § 691.1407(2). That statute provides that government employees are "immune from tort liability" if all of the following conditions are met:

> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.

> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.

> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

*Id.*; *Stanton v. City of Battle Creek*, 647 N.W.2d 508, 513 (Mich. S. Ct. 2002). The parties do not dispute that the first and second elements are met; thus, the question is whether Gilman, Risner, or Schultz were grossly negligent as to Wilber's medical needs.

21

Gross negligence is "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results. Furthermore, the grossly negligent misconduct must be the proximate cause" of the injury. *Tarlea v. Crabtree*, 687 N.W.2d 333, 339 (Mich. Ct. App. 2004) (citations and internal quotation marks omitted). This standard "suggests . . . almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks. It is as though, if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge." *Id.* at 339–40.

The Court finds that Gilman and Risner were not grossly negligent. After Wilber explained his symptoms to both deputies, both of them took steps to address his medical issue by contacting medical staff, explaining Wilber's symptoms, and following the staffs' directives. This was not an unreasonable step given that the deputies did not themselves have medical expertise and the usual procedure was to defer to the judgment of the medical staff. And in Gilman's case, he executed the procedure that Schultz told him was necessary by placing Wilber in medical isolation. "Simply alleging that an actor could have done more is insufficient under Michigan law, because, with the benefit of hindsight, a claim can always be made that extra precautions could have influenced the result." *Reilly v. Vadlamudi*, 680 F.3d 617, 627 (6th Cir. 2012) (citations omitted). There was no reason for either Gilman or Risner to believe that the nurse would not see Wilber at some point. Moreover, at the time they each interacted with Wilber, he was still able to move independently and was not exhibiting extreme symptoms that might have necessitated a different procedure.

Turning to Schultz, she argues that her conduct was not grossly negligent because from the time she first saw Wilber, her actions demonstrated that she was "genuinely concerned" with

his medical needs. (Dkt. 66 at 22.) While that may be a reasonable characterization of the facts as to October 26 alone, it does not fully address Wilber's claim. As stated above, there is a fact issue as to whether Schultz knew about Wilber's condition as of the afternoon of October 25, yet ordered him into medical isolation and did not come to see him until the next day when she was summoned by a sergeant. This delay at minimum caused Wilber additional pain, and because he was septic by the time he got to the hospital, a reasonable jury might conclude that his condition worsened significantly during this time. Moreover, Schultz's testimony indicates that inmates normally would not remain in isolation for more than fifteen to twenty minutes, and that she would usually try to see the inmate right away if he reported symptoms similar to Wilber's. A reasonable jury could find that Schultz's conduct in delaying medical care for Wilber amounted to gross negligence. *See Jones v. Pramstaller*, 678 F. Supp. 2d 609, 628 (W.D. Mich. 2009) (allowing a gross negligence claim to survive against a medical coordinator who had been informed that an inmate was reporting increasingly severe vision problems over a period of two weeks but did not order that the inmate be taken to the doctor).

For these reasons, Count III will survive as to Schultz but will be dismissed as to Gilman and Risner.

## IV. CONCLUSION

Wilber has not met his burden to show that Gilman and Risner's actions in following Jackson County policy and the instructions of its medical staff amounted to a constitutional violation or gross negligence. Nor has he shown that Jackson County's policies or training were so inadequate as to give rise to *Monell* liability. But taking the undisputed facts in Wilber's favor, Schultz took the unusual action of delaying Wilber's treatment by placing him in medical

23

isolation for almost a day, despite knowing of the symptoms that she would later conclude were indicative of appendicitis. Therefore,

IT IS ORDERED that Jackson County's Motion for Summary Judgment (Dkt. 65) is GRANTED, Rhonda Schultz's Motion for Summary Judgment (Dkt. 66) is DENIED, and Deputy Gilman and Clifford Risner's Motion for Summary Judgment (Dkt. 67) is GRANTED.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated: March 9, 2016


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on March 9, 2016.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson